## Commonwealth *v.* West, Appellant.

*Criminal law—Murder—Murder in the first degree—Intoxication—Premeditation.*

On the trial of an indictment for murder it appeared that at the time of the killing the prisoner, who had been drinking, was quarreling with a woman on the street, and flourishing a revolver. The deceased, who was a police officer, approached the prisoner and took hold of him, and requested the prisoner to go with him. The prisoner refused and fired a shot which took effect in the officer's leg, and caused him to fall. The prisoner then stepped back two or three steps, turned from the officer, then again faced him, and while advancing towards him fired two shots in quick succession at his head, one of the shots piercing his skull and causing death. The prisoner then fled. *Held* that a verdict of murder in the first degree should be sustained.

Argued Oct. 13, 1902. Appeal, No. 172, Jan. T., 1902, by defendant, from judgment of O. & T. Del. Co., March T., 1902, on verdict of guilty of murder in the first degree in case of Commonwealth v. Albert West. Before McCollum, C. J., Mitchell, Dean, Fell, Brown, Mestrezat and Potter, JJ. Affirmed.

Indictment of Albert West for the murder of Mark W. Allen, Jr., a police officer.

The circumstances of the killing are stated in the opinion of the Supreme Court.

Verdict of guilty of murder in the first degree. The prisoner appealed.

*Error assigned* was, "the ingredients of murder in the first degree do not exist in this case."

*Albert J. Williams,* for appellant.

*Josiah Smith,* district attorney, for appellee, was not heard.

Per Curiam, November 3, 1902:

There is but a single assignment of error here, and it alleges that "the ingredients of murder in the first degree do not exist in this case."

Albert West, the prisoner, shot and killed policeman Mark W. Allen in the city of Chester, about eleven o'clock on the night of February 1, 1902. During the afternoon and the evening of the day in question West had been drinking quite freely. He and his mistress, Addie Ballard, lived at 103 Lloyd street, in Chester. He had had occasion to reprove the woman for frequenting a disreputable quarter of the city known as " Tinder Box Row." On the evening of the homicide she left her home to go out in the city and later West also started for the same part of the city. In passing along the street he stopped in a hardware store and purchased a revolver, which was then loaded for him by the party from whom it was purchased. Returning to the street he met a friend who informed him that Addie Ballard was in Tinder Box Row. He went in search of her and found her there at a house where he had found her on a former occasion. He again reproved her for going to the house and they quarreled. They started home and continued to quarrel as they passed along the streets, he, for some distance flourishing his revolver and threatening to shoot Ballard. They passed down the south side of Third street and halted when they arrived at the intersection of Third and Pusey streets. They had attracted the attention of Officer Allen, who was standing on the south side of the street, and he followed them on that side of the street to Pusey street. The officer started to cross to the north side of Third Street and met West, who had left the woman and started to cross to the south side of the street. As West approached the officer Ballard told him not to hide his revolver and West said he was not hiding it. They met in the street and Allen, whom West recognized as an officer, took hold of him, requesting West to go with him, and attempted to take him to the sidewalk. West refused and fired a shot which took effect in the officer's left thigh, breaking his leg and causing him to fall to the sidewalk. West then stepped back two or three steps, turned from the officer, then again facing him and advancing toward him fired two shots in quick succession at his head, one of the shots piercing the skull and causing death. From the testimony it is apparent that some seconds, if not a minute, elapsed between the time of firing the first and subsequent shots. West fled and was subsequently captured.

The principal defense was intoxication. It did not avail the

prisoner before the jury, who were fully justified under the evidence in finding that the liquor he drank that night had not clouded his intellect to the extent of depriving him of the power to deliberate and premeditate the death of his victim. The charge to the jury and the answer to the points on the question of the prisoner's intoxication by the learned trial judge were as favorable to the prisoner as he had any right to expect.

We are all clearly of opinion that the ingredients of murder in the first degree exist in this case. The fatal shot was fired from a deadly weapon and was directed against a mortal part. There was sufficient evidence, if believed by the jury, of deliberation and premeditation. The first shot did not kill but only disabled the officer. Between it and the time of firing the second and fatal shot ample time elapsed to enable the prisoner to form a conscious design to kill and to carry it into effect. As said by Judge RUSH in Commonwealth v. Smith, "No time is too short for a wicked man to form in his mind his scheme of murder and to contrive the means of accomplishing it." More deliberation with a clearer intent to take human life is seldom seen in homicide cases. After the officer had fallen and was lying disabled on the pavement, West stepped away from him. He then had time to think and deliberate. He did so, and as a result of his deliberation he retraced his steps and with deadly aim fired a bullet into his victim's brain. A recital of the facts as shown by the evidence clearly disclosed all the elements of murder in the first degree.

The judgment is affirmed, and it is ordered that the record be remitted to the court of oyer and terminer of Delaware county that the judgment may be carried into execution according to law.